UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| RONNIE COLEMAN,<br><br>                              Petitioner,<br><br>v.<br><br>TERRY ROYAL,[1] et al.,<br><br>                              Respondents. | Case No. 3:19-cv-00172-ART-CSD<br><br>**ORDER DENYING SECOND-AMENDED PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2254**<br><br>**[ECF No. 36]** |

Counseled Petitioner Ronnie Coleman, who is incarcerated in the custody of the Nevada Department of Corrections, petitions for a writ of habeas corpus under 28 U.S.C. § 2254. (ECF No. 36.) This matter is before this Court for adjudication of the merits of the remaining grounds[2] in Coleman's Second-Amended Petition, which alleges that his trial counsel was ineffective, the jury instructions were flawed, and the trial court improperly precluded his cross-examination of witnesses. (ECF No. 36.) For the reasons discussed below, this Court denies the Second-Amended Petition and a certificate of appealability.

**I.    BACKGROUND**

**A.    Factual background[3]**

Salvador Murillo testified that he was gambling at a slot machine at the Diamonds Casino in Reno, Nevada on the night of July 7, 2007, when he met a

---

[1] The state corrections department's inmate locator page states that Coleman is incarcerated at Ely State Prison. Terry Royal is the current warden for that facility. At the end of this order, this court directs the clerk to substitute Terry Royal as a respondent for Respondent William Gittere. *See* Fed. R. Civ. P. 25(d).
[2] This Court previously dismissed grounds 4(b) and 5. (ECF No. 86.)
[3] This Court makes no credibility findings or other factual findings regarding the truth or falsity of the evidence from the state court. This Court's summary is merely a backdrop to its consideration of the issues presented in the case.

1

woman named Rosie. (ECF No. 42-27 at 46–48.) After chatting for a little while, Rosie "said if [Murillo] g[a]ve her $80[,] she would go have sex with [him]." (*Id.* at 51.) Murillo agreed to pay $60, and Rosie said "[t]hat she would be waiting outside in the parking lot." (*Id.* at 52.) After he finished gambling, Murillo met Rosie in the parking lot, they got into his truck, and Murillo drove to a bank "[t]o withdraw the money so that [he] could pay her." (*Id.* at 54–55.) Murillo then drove and parked his truck in a secluded area, and he and Rosie exited the truck and sat on the truck's tailgate. (*Id.* at 58.) After a short time, a man, later identified as Coleman, appeared, pointed a gun at Murillo, and told Murillo that he was robbing him. (*Id.* at 59.) Coleman hit Murillo in the face, took his wallet, and ordered him to take off his boots and belt. (*Id.* at 62–65.) When Coleman tried to tie Murillo's hands with the belt, Murillo ran barefoot to a nearby trailer park, and after finding a man to help him, he called the police. (*Id.* at 66.)

Rosie Davis testified that she was dating Coleman in July of 2007, and that they decided to visit Reno from Sacramento to gamble and to rob someone. (ECF No. 42-28 at 72–75.) Their "plan was [she] was supposed to act like [she] was going to turn a date like a prostitute and that [Coleman] was going to rob the guy." (*Id.* at 75–76.) Davis met Murillo at the casino and decided he would be a good target for a robbery. (*Id.* at 84.) Later, after Coleman arrived to rob Murillo in the secluded area, Davis ran to Coleman's car nearby. (*Id.* at 105.) As Davis was sitting in the car waiting for Coleman, a police officer pulled up and "told [her] to get out of there." (*Id.* at 107.) Davis drove a little way, did a U-turn, drove back to the area, and, after seeing Murillo running from the robbery and the police officer responding, she drove back to her motel and then back to Sacramento.[4] (*Id.* at 108–112.)

---

[4]Davis originally told the police that she "was turning a date and that the guy turned on [her] and he had a gun and that [Coleman] tried to save [her]." (ECF No. 42-28 at 114.) Davis admitted this was a lie when she testified at the trial. (*Id.*) Davis was charged as an accomplice to the robbery.

Officer Alan Weaver testified that he was the officer who encountered Davis in Coleman's car and told her that "she needed to leave." (ECF No. 42-30 at 88, 101.) Officer Weaver parked his patrol car, and "[a]s [he] was sitting there trying to get the computer to work . . . , [he] noticed this guy walk out from this corner of the building." (*Id.* at 108.) The man, later identified as Coleman, "was wearing a very heavy winter type parka jacket that was long, over the waistband area[, a]nd he had his hands pushed into the pockets of the jacket as he walked by." (*Id.* at 109.) Officer Weaver testified that when Coleman "walked past the front of [his] car, [Coleman] made no attempt to look at [Officer Weaver]," explaining that Coleman simply "walked past ignoring the fact that there was a police car sitting in the parking lot with the lights on." (*Id.* at 110.) Officer Weaver followed Coleman in his patrol car and turned on his spotlight. (*Id.* at 111.) Officer Weaver then asked Coleman to talk to him for a minute, and Coleman, who appeared agitated and had his hands in his pockets, turned around, walked back towards Officer Weaver, and stated that he had not done anything wrong. (*Id.* at 113–115.) Officer Weaver told Coleman three times to take his hands out of his pockets, and because Coleman did not comply, Officer Weaver "unsnapped [his] sidearm, drew it and held it by [his] leg." (*Id.* at 115.)

At this point in their encounter, "Coleman [was] at the front of [the] police car," and Officer Weaver was "standing in the doorway to the car with the door positioned between" them. (*Id.*) Officer Weaver then "walked back to the back of the police car," and because Coleman "was still refusing to take his hands out of his pockets and was still . . . advancing on" Officer Weaver, Officer Weaver pointed his firearm at Coleman. (*Id.* at 119.) Officer Weaver "notified dispatch that [he] had the guy at gunpoint and no sooner did [he] do that than [Coleman] ran away from [him]." (*Id.* at 121.) Officer Weaver pursued Coleman because "[h]e wasn't displaying normal behavior and [he] thought he was someone [he] needed to find out what was going on." (*Id.* at 123.) Coleman "ke[pt] his right hand in his jacket

pocket as he ran." (*Id.* at 124.) When Coleman reached the corner of a nearby building, "he pulled his right hand out of his pocket and had a black semiautomatic pistol in his hand and pointed the pistol at" Officer Weaver. (*Id.* at 125.) Officer Weaver then fired his weapon seven times. (*Id.* at 128, 139.) Coleman was shot twice: once in the left knee and once in the upper left thigh. (ECF No. 42-36 at 173–74.)

## B. Procedural background

The jury found Coleman guilty of robbery with the use of a deadly weapon and assault with a deadly weapon, but the jury found Coleman not guilty of resisting, obstructing, or delaying a public officer with a dangerous weapon. (ECF No. 43-1.) Coleman was sentenced to an aggregate of 14 to 36 years in prison. (ECF No. 43-17.) Coleman appealed his judgment of conviction, and the Nevada Supreme Court affirmed. (ECF No. 44-1 at 2.) Coleman sought state post-conviction relief, but the state court denied his petition. (ECF No. 45-1.) The Nevada Court of Appeals reversed the denial and remanded the matter to the state court to "consider whether appointment of new post-conviction counsel or some other remedy is necessary." (ECF No. 45-17.) Following the remand, the state court again denied Coleman's petition. (ECF No. 46-3.) The Nevada Court of Appeals affirmed the denial. (ECF No. 46-19.)

Coleman transmitted his *pro se* federal habeas corpus petition on or about March 18, 2019. (ECF No. 5.) This Court appointed counsel for Coleman, and counsel filed First- and Second-Amended Petitions. (ECF Nos. 9, 23, 36.) Respondents moved to dismiss Coleman's Second-Amended Petition, but this Court granted Coleman's motion to strike the motion to dismiss. (ECF No. 64.) Respondents then filed a new motion to dismiss. (ECF No. 69.) This Court granted the motion, in part, finding that grounds 4(b) and 5 were unexhausted. (ECF No. 81.) Coleman moved to voluntarily dismiss his unexhausted grounds, so this Court dismissed grounds 4(b) and 5. (ECF No. 86.) Respondents answered the

remaining grounds in Coleman's Second-Amended Petition on March 23, 2023, and Coleman replied on April 12, 2024. (ECF Nos. 93, 109.)

## II.    GOVERNING STANDARDS OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that

a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

## III.    DISCUSSION

### A.    Ground 1—ineffective assistance of counsel

In ground 1, Coleman alleges that he was denied the effective assistance of trial counsel as guaranteed by the Sixth and Fourteenth Amendments. (ECF No. 36 at 11.)

#### 1.    Standard for ineffective assistance of counsel claims

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to

establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Richter*, 562 U.S. at 104–05. In *Richter*, the United States Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *Id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential."). The Supreme Court further clarified that, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

### 2. Ground 1(a)—motion to sever the charges.

In ground 1(a), Coleman alleges that his original trial counsel failed to file a motion to sever the charges related to Murillo from those related to Officer Weaver, filing instead a motion to join the charges. (ECF No. 36 at 12.)

### a. Background information

On July 16, 2007, in case number CR07-2132, the prosecution filed a criminal complaint in the state justice court, charging Coleman with robbery with the use of a deadly weapon, assault with a deadly weapon, resisting and/or obstructing and/or delaying a public officer with a dangerous weapon, and being an ex-felon in possession of a firearm. (ECF No. 39-1.) Later, on October 17, 2007, the prosecution presented the case to the grand jury and then filed an indictment

in a different case, case number CR07-2673, charging Coleman with robbery with the use of a deadly weapon, attempted murder with a deadly weapon, assault with a deadly weapon, resisting and/or obstructing and/or delaying a public officer with a dangerous weapon, being an ex-felon in possession of a firearm, and being an ex-felon in possession of an electronic stun gun. (ECF No. 39-25.)

Coleman's original trial counsel moved for joinder of the cases, explaining that "Counts I, III and IV [in case CR07-2673] are identical to the three counts in CR07-2132." (ECF No. 39-30.) At a hearing on the motion, Coleman's original trial counsel explained that the charges in case number CR07-2132 were repeated in case number CR07-2673 and that consolidation of the cases was needed because (1) pre-trial motions in both cases would be redundant and nonsensical and (2) the jail's records incorrectly reflected that Coleman was being charged with nine counts—the six counts from the indictment plus the unnecessarily repeated three counts from the information—meaning his bail amount and classification at the jail were being negatively affected. (ECF Nos. 39-30, 39-37 at 5–6.) The trial court "consolidate[d] the two cases." (ECF No. 39-37 at 6.)

A year later, and after new trial counsel had been appointed for Coleman, Coleman unsuccessfully moved to withdraw his motion for joinder and for severance of the Murillo charges from the Officer Weaver charges. (ECF Nos. 41-7 at 7, 41-8 at 15.) Approximately six months later, Coleman's counsel filed a "second motion to sever" the "armed robbery [counts] from [the] Weaver counts," but the motion was again denied. (ECF No. 42-12.) Finally, on the morning of the first day of trial, Coleman's counsel "renew[ed] the motion to sever," in light of the prosecution's dismissal of the attempted murder count. (ECF No. 42-27 at 5.) The trial court again denied the motion. (*See id.* at 6.)

### b.    State court determination

In affirming Coleman's judgment of conviction, the Nevada Supreme Court

held:

Coleman argues that he was denied due process because there was no statutory basis for joinder of his robbery-with-a-deadly-weapon and assault-with-a-deadly-weapon charges. We disagree.

A decision not to sever is reviewed for an abuse of discretion. *Weber v. State*, 121 Nev. 554, 575, 119 P.3d 107, 121 (2005). NRS 173.115 provides that multiple offenses may be charged if the charges are "[b]ased on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Offenses are "connected together" if evidence of either offense is cross-admissible to prove the other offense. *Weber*, 121 Nev. at 573, 119 P.3d at 120. Such evidence is admissible if it is relevant, proven by clear and convincing evidence, and has probative value that substantially outweighs the risk of unfair prejudice. *Id.* Severance is mandated if joinder is unfairly prejudicial. *Weber*, 121 Nev. at 574, 119 P.3d at 121. Unfair prejudice exists if joinder is so prejudicial that it outweighs "judicial economy and compels the exercise of the court's discretion to sever." *Tabish v. State*, 119 Nev. 293, 304, 72 P.3d 584, 591 (2003) (internal citations omitted).

The district court considered the Murillo robbery and Weaver assault as two acts. It found that they were connected because the assault was relevant to prove Coleman's identity in the robbery and the robbery was relevant to explain Coleman's conduct in the assault. It also agreed with the State that cross-admissibility existed as evidence of flight, as consciousness of guilt, and as corroboration of the victim's testimony. The district court reasoned that the state would need to explain Coleman's actions. Finally, the district court concluded that the counts were properly joined because the acts that constituted each crime were almost a continuing action, and therefore, the evidence demonstrating each charge was cross-admissible to prove the other charge. We conclude that the district court did not abuse its discretion in finding that evidence of the crimes were connected together.

Coleman also argues that unfair prejudice required severance. At trial, the State identified Coleman by tying the robbery evidence to Coleman's clothing, which was seized by the police after Coleman was arrested for assaulting Officer Weaver. The State also explained that Coleman committed the assault because he had committed the robbery. This is not an impermissible use of propensity evidence. *See Fields v. State*, 125 Nev. 220 P.3d 709, 713 (2009). Further, Coleman originally stipulated to the joinder and points to nothing in the record that demonstrates joinder was so prejudicial as to outweigh judicial economy. Nevada caselaw has consistently upheld joinder involving more heinous acts. *See, e.g., Floyd v. State*, 118 Nev. 156, 162-65, 42 P.3d 249, 253-55 (2002) (upholding the joinder of kidnapping and four counts of sexual assault with a deadly weapon against one victim, with four counts of first degree murder with a deadly weapon against four other victims), *abrogated on other grounds by Grey v. State*, 124 Nev. 110, 113-119, 178 P.3d 154, 160-61 (2008). We conclude that the district court did not abuse its discretion by failing to sever the robbery and assault.

[FN2] Coleman also argues that the district court erred by failing to give a contemporaneous limiting instruction. Notably, the district court gave an

> instruction at the close of trial that instructed the jury to decide each offense separately. This instruction was sufficient for purposes of joinder and Coleman offers "no reason to abandon the customary presumption" that the jury followed this instruction. *See Weber*, 121 Nev. at 575, 119 P.3d at 121 (concluding that the general instruction at the close of trial was sufficient to inform the jury of its duty to decide each offense separately).

(ECF No. 44-1 at 5–7.)

In his state habeas petition, Coleman alleged that his trial counsel's failure to sever the charges amounted to ineffective assistance of counsel. (*See* ECF No. 46-3 at 3.) The state court denied the claim, finding that "the Nevada Supreme Court considered this matter on [direct] appeal, and determined that joinder of the charges did not result in prejudice to the defendant." (*Id.*) Coleman raised his ineffective-assistance-of-trial-counsel claim in his appeal of the denial of his state habeas petition, but he clarified that he was "only presenting the[ ] claim[ ] for purposes of exhaustion." (ECF No. 46-19 at 6–7.)

### c.    Analysis

To be sure, severing the charges related to Murillo from the charges related to Officer Weaver would have been beneficial to Coleman at the trial stage. However, Coleman fails to demonstrate that his original trial counsel rendered ineffective assistance of counsel in filing a motion for joinder. First, Coleman's trial counsel's motion for joinder did not concern joining the charges related to Murillo with the charges related to Officer Weaver. Rather, Coleman's trial counsel's motion for joinder concerned consolidating the two state courts cases— case numbers CR07-2132 and CR07-2673—for procedural purposes because the charges in the latter case subsumed the charges in the former case, making the former case superfluous. Second, it appears that Coleman's trial counsel had a sound basis to join the two cases: Coleman's status at the jail was being negatively impacted by the inclusion of the three repeated charges from the information. Third, regarding prejudice, when the trial court granted Coleman's

original trial counsel's motion, it noted that it was "not really joining anything," but rather was just consolidating the case numbers. (ECF No. 39-37 at 6.) As such, even absent Coleman's trial counsel's motion, it appears that the trial court would have consolidated the cases. Fourth, also regarding prejudice, Coleman fails to demonstrate that, but for his original trial counsel's motion for joinder, there is a reasonable probability that the result of his later motions to sever would have been different. Indeed, the joining of the two overlapping cases for foretold procedural reasons and the severing of the charges relating to the robbery of Murillo from the charges relating to Officer Weaver presented different legal issues, demonstrating that there is no clear connection between the motion for joinder and the later motions to sever.

Because the Nevada Supreme Court's determination constituted an objectively reasonable application of federal law and was not based on an unreasonable determination of the facts, Coleman is denied habeas relief for ground 1(a).

### 3.    Ground 1(b)—motion to suppress evidence.

In ground 1(b), Coleman alleges that his trial counsel failed to move to suppress evidence from his detention on the basis that Officer's Weaver's stop was pretextual and based upon his race.[5] (ECF No. 36 at 13.)

### a.    Background information

Coleman's trial counsel moved to suppress "all evidence seized by the unlawful stop and detention of [Coleman] on July 7, 2007, by Officer Weaver," arguing that Officer Weaver had no legal right to make the stop under *Terry v. Ohio*. (ECF No. 40-20.) A motion to suppress evidentiary hearing was held, and Officer Weaver testified, *inter alia*, that (1) it was approximately 11:30 p.m. when he saw Coleman in an "industrial" portion of Reno where Officer Weaver "ha[d]

_____

[5]Notably, Coleman is black, and Officer Weaver is white.

never seen anybody working at" during the night, (2) Coleman "was wearing a heavy winter type jacket with his hands buried into the pockets" even though it was July, (3) Coleman's behavior was concerning due to "the way that he was walking, not looking at [him]," and (4) Coleman refused to take his hands out of his jacket pockets. (ECF No. 40-29 at 39–40, 48, 55, 57.) The trial court denied the motion to suppress, finding, *inter alia*, "that it was appropriate to briefly detain Mr. Coleman to investigate the possibility of burglary or other criminal activities" due to (1) the area where Coleman was located, (2) the time of day, (3) the fact that Coleman ignored Officer Weaver, (4) Coleman's refusal to listen to Officer Weaver, (5) Coleman's placement of his hands in his pockets, and (6) Coleman's menacing movements. (*Id.* at 207–08.)

Coleman's trial counsel later filed a second motion to suppress, which "reache[d] beyond [the] *Terry* issues" discussed in the first motion to suppress and regarded "the actual seizure of Mr. Coleman, which occurred when Officer Weaver used excessive, deadly force." (ECF No. 42-8 at 3.) The trial court denied the second suppression motion, explaining that Coleman "kept approaching the police officer at night when he was told to stop and remove his hands and he did not and the police officer was justified in thinking that, 'Hey, this guy may have a weapon.'" (ECF No. 42-19 at 29–30.)

### b.   State court determination

In affirming the denial of Coleman's state habeas petition, the Nevada Court of Appeals held:

> Coleman argues the district court erred by dismissing his claim counsel was ineffective for failing to argue Officer Weaver's chasing and shooting of Coleman was racially motivated without first conducting an evidentiary hearing. The district court found that while this claim was supported by specific facts, the factual allegations, if true, would not entitle Coleman to relief because Officer Weaver had reasonable suspicion to stop Coleman that night. Substantial evidence supports the decision of the district court, and we conclude Coleman fails to demonstrate the district court erred by dismissing this claim without holding an evidentiary hearing.

1  (ECF No. 46-19 at 5.)

2  **c. Analysis**

3    Given Coleman's race, Coleman's trial counsel certainly could have used

4  race as a basis to argue that the initial *Terry* stop by Officer Weaver was

5  pretextual. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968) (holding that a police officer

6  may briefly stop an individual "where [the] police officer observes unusual

7  conduct which leads him reasonably to conclude in light of his experience that

8  criminal activity may be afoot and that the persons with whom he is dealing may

9  be armed and presently dangerous"). However, Coleman fails to demonstrate that

10  such an argument would have been fruitful.

11    As the Nevada Court of Appeals reasonably determined, substantial

12  evidence supported the trial court's determination that Officer Weaver had

13  reasonably objective suspicions to conduct a *Terry* stop of Coleman. Indeed,

14  Coleman fails to demonstrate that the aggregate objective bases for the stop—the

15  time of day, the location, and Coleman's clothing, demeanor, and placement of

16  his hands—were unreasonable. And because "[s]ubjective intentions play no role

17  in ordinary, probable-cause Fourth Amendment analysis," Officer Weaver's

18  alleged racial bias was inconsequential to the trial court's determination on the

19  motion to suppress. *See Whren v. United States*, 517 U.S. 806, 813 (1996)

20  (explaining that Supreme Court "cases foreclose any argument that the

21  constitutional reasonableness of traffic stops depends on the actual motivations

22  of the individual officers involved," and while agreeing "that the Constitution

23  prohibits selective enforcement of the law based on considerations such as race,"

24  clarifying that "the constitutional basis for objecting to intentionally

25  discriminatory application of laws is the Equal Protection Clause, not the Fourth

26  Amendment"); *see also United States v. Taylor*, 60 F.4th 1233 (9th Cir. 2023)

27  ("The officers' subjective motivations, whatever they may have been, could not

28  change the objective reasonableness of their actions.").

Because the Nevada Supreme Court's determination constituted an objectively reasonable application of *Strickland* and was not based on an unreasonable determination of the facts, Coleman is denied habeas relief for ground 1(b).

## B.    Grounds 2 and 4(a)—jury instructions.

In ground 2, Coleman alleges that the trial court denied him due process by allowing Jury Instruction No. 22, which failed to instruct the jury that they needed to find that he aimed a firearm at Officer Weaver to meet their burden of proof under the indictment. (ECF No. 36 at 13.) Relatedly, in ground 4(a), Coleman alleges that Jury Instruction No. 27 was confusing, misleading, and/or misstated the law. (*Id.* at 20.) Specifically, in ground 4(a), Coleman alleges that the instructions did not clearly define "use" of a deadly weapon, explaining that the jury was not informed whether it could convict him of assault with a deadly weapon for merely holding a gun while running or whether the prosecution needed to prove that he brandished or aimed the gun at Officer Weaver. (*Id.*)

### 1.    State court determination

In affirming Coleman's judgment of conviction, the Nevada Supreme Court held:

> Coleman argues that the jury should have been instructed that a conviction for assault with a deadly weapon required a finding that he pointed a gun at Weaver. He contends that allowing the jury to convict him of the assault charge based upon evidence that he displayed a weapon constituted a fatal variance between the indictment and jury instruction. We disagree.
>
> "[F]ailure to clearly object. . . to a jury instruction [generally] precludes appellate review." *Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003). Yet discretion exists to address an error that is plain and affects the defendant's substantial rights. *Id.* An accused must be clearly informed as to the charges set forth in the indictment so that there is an opportunity to adequately prepare for trial and not be surprised by evidence. *Id.* at 74, 605 P.2d at 204. Reversible error based on a variance between an indictment and a jury instruction exists only if the variance affects substantial rights of the accused. *State v. Jones*, 96 Nev. 71, 73-74, 605 P.2d 202, 204 (1980). Coleman points to the charging document, which alleged that Coleman committed the assault because he aimed a firearm at Weaver while attempting to elude the officer, and argues that the jury

should have been instructed to determine whether Coleman pointed his weapon at Weaver. We disagree.

Instead, we conclude that Coleman was sufficiently informed of the nature of the assault charge. Moreover, the State consistently argued that Coleman pulled a handgun on Weaver, the instruction adequately set forth the elements of assault with a deadly weapon, and the instruction was inconsequential to Coleman's defense that he did not have a gun. Coleman may be correct that a jury would have acquitted him of the assault charge if the instruction included aiming or pointing, but assault-with-a-deadly weapon does not require such a finding and the jury could have found Coleman guilty without finding he aimed or pointed his weapon at Weaver. *See* NRS 200.471. We therefore conclude that Coleman failed to demonstrate that his substantial rights were affected. As a result, the district court did not abuse its discretion in giving the assault instruction and no reversible error exists based on any variance between the indictment and the instruction.

(ECF No. 44-1 at 7–8.)

### 2.    Standard

Issues relating to jury instructions are not cognizable in federal habeas corpus unless they violate due process. *Estelle v. McGuire,* 502 U.S. 62, 72 (1991); *see also Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("[W]e have never said that the possibility of a jury misapplying state law gives rise to federal constitutional error."). The question is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process', . . . not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973)).  And significantly, when reviewing a jury instruction, this Court considers that jury instruction "in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72; *see also United States v. Frega*, 179 F.3d 793, 806 n.16 (9th Cir. 1999) ("In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation.").

### 3.    Analysis

This Court first addresses ground 2. In the indictment filed on October 17, 2007, Coleman was charged with, *inter alia*, "assault with a deadly weapon, a

violation of NRS 200.471." (ECF No. 39-25 at 3.) The indictment alleged that Coleman "intentionally place[d] Officer A.J. Weaver . . . in reasonable apprehension of immediate bodily harm, with the use of, or present ability to use, a deadly weapon, to wit: a firearm, in that the defendant *aimed the firearm at the officer* while attempting to elude the officer." (*Id.* (emphasis added).) This language from the indictment was repeated verbatim at the beginning of the jury instructions where Coleman's charges were listed. (*See* ECF No. 42-40 at 13.) However, in Jury Instruction No. 22, the jury was instructed as follows on the definition of assault with a deadly weapon: "[t]he crime of assault with a deadly weapon consists of the following elements: (1) [a] person intentionally places another person in reasonable apprehension of immediate bodily harm; (2) [w]ith the present ability to use a deadly weapon." (*Id.* at 34.) Coleman argues that this jury instruction lessened the prosecution's burden of proof because rather than having to prove that he aimed the gun at Officer Weaver, as the prosecution alleged in the indictment, this instruction only required the prosecution to prove that he had the ability to use the gun.

While this Court acknowledges the variance between the indictment and Jury Instruction No. 22, the Nevada Supreme Court reasonably determined that the trial court did not abuse its discretion in giving Jury Instruction No. 22. As the Nevada Supreme Court reasonably concluded, this instruction adequately set forth the elements of assault with a deadly weapon under Nevada law. Nevada Revised Statute § 200.471(2)(d) provides that "assault is committed upon an officer" when the perpetrator "use[s] a deadly weapon or [has] the present ability to use a deadly weapon." Therefore, even though Jury Instruction No. 22 broadened the scope under which the jury could convict Coleman when compared to prosecution's original theory of prosecution in the indictment, Jury Instruction No. 22 complied with Nevada law and was not erroneous. Moreover, the indictment listed Nevada Revised Statute § 200.471 (*see* ECF No. 39-25 at 3),

so Coleman was on notice of the statutory elements of the crime with which he was charged. Thus, Coleman fails to demonstrate that Jury Instruction No. 22 violated his right to due process.

Turning to ground 4(a), Jury Instruction No. 27 provided as follows: "In order to 'use' a deadly or dangerous weapon, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of the deadly or dangerous weapon in aiding the commission of the crime." (ECF No. 42-40 at 39.) And as was discussed previously, the jury was instructed that assault with the use of a deadly weapon consisted of merely "the present ability to use a deadly weapon" in Jury Instruction No. 22. (ECF No. 42-40 at 34) As is relevant here, when reading Jury Instruction Nos. 22 and 27 in conjunction, it is clear that the prosecution only had to prove, at a minimum, that Coleman had the ability to display a deadly weapon to satisfy the "use" element of the assault charge. Although this Court acknowledges that the word "means" as used in Jury Instruction No. 27 may have been confusing, the word "display," which is used in the conjunctive with "means," is not confusing. Further, in comparing Jury Instruction No. 27 with Jury Instruction No. 38, which regarded the resisting, obstructing or delaying a public officer charge, it is clear that "use" of a deadly weapon in the context of the assault charge required something less than "pointing" a deadly weapon. (ECF No. 42-40 at 50.) Consequently, in reviewing Jury Instruction No. 27 in the context of the jury instructions as whole, Coleman fails to demonstrate that Jury Instruction No. 27 violated his right to due process.

In sum, because the Nevada Supreme Court's determination constituted an objectively reasonable application of federal law and was not based on an unreasonable determination of the facts, Coleman is denied habeas relief for grounds 2 and 4(a).

//

**C.    Ground 3—trial court limited cross-examination of witnesses.**

In ground 3, Coleman alleges that the trial court precluded cross-examination of Murillo and Davis on their potential bias or motive to fabricate in violation of his right to Confrontation as guaranteed by the Sixth and Fourteenth Amendments. (ECF No. 36 at 16.)

**1.    Background information**

The following colloquy took place during Coleman's trial counsel's cross-examination of Murillo:

| | |
|---|---|
| Defense counsel: | Did you talk to your wife and tell her when you would be home before you left? |
| Prosecutor: | Objection, your Honor. Relevancy. |
| Trial Court: | Sustained. |
| Defense counsel: | Have you had to explain to your wife why you still had not arrived home by 4:30 in the morning? |
| Prosecutor: | Objection. Relevancy. |
| Defense counsel: | It goes to bias and - - |
| Trial Court: | Sustained. |
| Defense counsel: | Have you told your wife you were the victim of a robbery? |
| Prosecutor: | Objection. Relevancy. |
| Trial Court: | Sustained. |
| Defense counsel: | Have you told your wife that you were up on the top of that hill with a prostitute? |
| Prosecutor: | Objection, relevancy. |
| Trial Court: | Sustained. |
| Defense counsel: | Motive to fabricate the robbery. |
| Trial Court: | Sustained, counsel. Next question. |
| Defense counsel: | Are you still married together with your wife? |
| Prosecutor: | Objection. Relevancy. |
| Trial Court: | Sustained. |
| Defense counsel: | The times that you have had to come to court, have you explained to your wife that it was because of a robbery? |
| Prosecutor: | Objection, your Honor. Objection. Relevancy. |
| Trial Court: | Sustained. |

(ECF No. 42-28 at 51–52.)

Later, while cross-examining Davis, Coleman's trial counsel sought to ask her about her relationship with her attorney:

I want to ask her if she was actually happy with her attorney and the representation that she received or whether or not she was just scared to death that she had him for a lawyer and figured, if she stuck with him and didn't strike a deal [to testify against Coleman in

return for leniency], she was on her way to prison. Because, if she is gripped with that sense of helplessness, that affects the weight and credibility, your Honor, of what any of us would judge to be, you know, the believability of what she is saying.

(ECF No. 42-28 at 136.) The trial court allowed Davis to be asked why she decided to plead guilty, but it disallowed "specific conversations[ ] between attorney and client, unless she waives that privilege." (*Id.* at 137.) Coleman's trial counsel then sought permission to question Davis about her preliminary hearing to see "what kind of confidence she had in [her attorney] after sitting in court and watching him represent her that day." (*Id.* at 139–140.) The trial court disallowed that line of questioning because Davis had not waived her attorney/client privilege. (*Id.* at 147.)

Coleman's trial counsel asked Davis if her attorney was appointed or retained. (*Id.* at 148.) The prosecutor objected, and Coleman's trial counsel explained that he wanted to delve into whether she had a choice of who would be representing her. (*Id.* at 148–49.) The trial court sustained the objection. (*Id.* at 150.) Later, during a bench conference, regarding this line of questioning, Coleman's trial counsel stated that "it is relevant that [Davis's attorney] presented to her as bumbling and incompetent," implying that the only for Davis to stay out of prison was to please the prosecutors by implicating Coleman. (*Id.* at 154.)

Later, Coleman explained that Davis had lied about having $1,500 in her bank account and about having a job at the time of the robbery. (ECF No. 42-30 at 6.) Coleman then explained that he requested that his counsel "pull up the records of her bank account at the time of the incident . . . to test her credibility." (*Id.*) Coleman's trial counsel then asked the trial court to issue "a certificate of materiality subpoena duces tecum." (*Id.* at 10.) The trial court denied the request, finding that Davis's bank records were not material because people steal money even when they have money. (*Id.* at 11, 13.) However, the trial court explained that "if you want to do it, you have an investigator. Get him on the job." (*Id.* at 9.) //

19

## 2.    State court determination

In affirming Coleman's judgment of conviction, the Nevada Supreme Court held:

> Coleman argues that the district court abused its discretion by limiting his cross-examination of Murillo and Davis. We disagree.
> A district court's evidentiary decisions are generally reviewed for an abuse of discretion, but a potential violation of the Confrontation Clause is a question of law reviewed de novo. *Chavez*, 125 Nev. at , 213 P.3d at 484. During cross-examination, the district court limited Coleman from questioning Murillo about condoms, his marital status and his wife's knowledge of the robbery. Coleman argued that Murillo's thinking about a condom prior to the robbery was relevant to his claim that a man jumped out of the dark with a gun. Coleman also argued that Murillo had a motive to fabricate the robbery and Coleman sought to ask Murillo whether he was still married, whether he had to explain the robbery to his wife, or whether she knew he was with a prostitute. The district court found the questions irrelevant. The condom question is irrelevant and the marital questions are marginally relevant at best.
> Coleman also attempted to probe Davis about her confidence in her attorney. The district court allowed Coleman to ask whether Davis was satisfied with her counsel, but not about specific conversations with her counsel because such communications were privileged. Coleman was also precluded from asking whether Davis' attorney was appointed and whether her attorney raised any substantive or procedural issues on her behalf after the State objected based on relevancy. Finally, Coleman was precluded from asking Davis about whether she knew the police and prosecution's theory of the robbery, but an objection was sustained as to speculation. In sum, nothing in the trial transcripts cited by Coleman establish that he was erroneously limited from probing whether Davis perceived her attorney as incompetent, that she felt helpless, or that she knew the state expected her to testify something other than the truth. We conclude that the district court did not abuse its discretion in limiting the cross-examination of Davis or Murillo.

(ECF No. 44-1 at 10–11.)

## 3.    Standard

The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "[A] primary interest secured by [the Confrontation Clause] is the right of cross-examination." *Douglas v. Alabama*, 380 U.S. 415, 418 (1965); *see also Maryland v. Craig*, 497 U.S. 836, 845 (1990) ("The central concern of the Confrontation Clause is to ensure the

reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."); *Delaware v. Fensterer*, 474 U.S. 15, 22 (1985) ("[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose . . . infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony."); *Davis v. Alaska*, 415 U.S. 308, 316 (1974) ("Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested."). While "the Confrontation Clause guarantees an opportunity for effective cross-examination," it does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (internal quotation marks omitted); *see also Kentucky v. Stincer*, 482 U.S. 730, 739 (1987) ("[T]he Confrontation Clause's functional purpose i[s] ensuring a defendant an opportunity for cross-examination."). "A criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." *Van Arsdall*, 475 U.S. at 680.

Further, "[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *DePetris v. Kuykendall*, 239 F.3d 1057, 1062 (9th Cir. 2001) ("The Supreme Court has made clear that the erroneous exclusion of critical, corroborative defense evidence may violate both the Fifth Amendment due process right to a fair trial and the Sixth Amendment right to present a defense."). "[T]he Constitution [also] guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).

1

### 4.   Analysis

2    The Nevada Supreme Court reasonably determined that the trial court did

3    not erroneously limit Coleman's trial counsel's cross-examination of Murillo or

4    Davis, so Coleman fails to demonstrate that his right to confront Murillo or Davis

5    or his right to defend against the prosecution's accusations were violated. As the

6    Nevada Supreme Court reasonably noted, Coleman's trial counsel's questions to

7    Murillo about his marriage lacked relevancy. Indeed, contrary to Coleman's

8    contention, it is nonsensical that Murillo fabricated the robbery to conceal his

9    interaction with a prostitute from his wife because reporting the robbery only

10   ensured that Murillo's activities at the time of the robbery would come to light.

11   Turning to Davis, the Nevada Supreme Court reasonably noted that

12   Coleman was not unduly limited from probing Davis. Coleman's trial counsel

13   desired to question Davis about whether her second statement to the police

14   implicating Coleman was truthful <u>or</u> whether Davis was unsatisfied with her

15   attorney's representation and recanted her initial statement to the police merely

16   to pursue a plea deal and avoid having to go to trial with an incompetent attorney.

17   Although the trial court disallowed more penetrating questions that would have

18   violated Davis's attorney/client privilege, the trial court allowed Coleman's trial

19   counsel to ask Davis why she pled guilty and whether she simply told the police

20   what they wanted to hear in recanting her initial statement. These broad

21   questions sufficiently satisfied an examination into Davis's state of mind and

22   potential bias. In fact, due to Davis's response that she told the police the truth

23   during her second statement (*see* ECF No. 42-28 at 224), more specific questions

24   to attempt to impeach Davis would not have been fruitful. Additionally, it is

25   nonsensical that Davis would have lied in recanting her initial statement and

26   making her second statement because in implicating Coleman under her second

27   statement, Davis cemented her own role in the robbery.

28   Moreover, regarding Davis's bank account, the trial court did not preclude

1   Coleman's trial counsel from seeking to obtain Davis's bank account record. It

2   merely denied the request for a subpoena to do so given that Coleman's trial

3   counsel had an investigator who could investigate the issue if needed.

4       Accordingly, because Coleman was provided an opportunity for effective

5   cross-examination of Murillo and Davis, the Nevada Supreme Court's

6   determination constituted an objectively reasonable application of federal law and

7   was not based on an unreasonable determination of the facts. Coleman is denied

8   habeas relief for ground 3.

9   **IV.    CERTIFICATE OF APPEALABILITY**

10      Rule 11 of the Rules Governing Section 2254 Cases requires this Court to

11  issue or deny a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Turner v.*

12  *Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002). Pursuant to 28 U.S.C. §

13  2253(c)(2), a certificate of appealability may issue only when the petitioner "has

14  made a substantial showing of the denial of a constitutional right." With respect

15  to claims rejected on the merits, a petitioner "must demonstrate that reasonable

16  jurists would find the district court's assessment of the constitutional claims

17  debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot*

18  *v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a certificate

19  of appealability will issue only if reasonable jurists could debate (1) whether the

20  petition states a valid claim of the denial of a constitutional right and (2) whether

21  this Court's procedural ruling was correct. *Id.*

22      Applying these standards, this Court finds that a certificate of appealability

23  is unwarranted.

24  **V.    CONCLUSION**

25      It is therefore ordered that the Second-Amended Petition [ECF No. 36] is

26  denied.

27      It is further ordered that a certificate of appealability is denied.

28      It is further ordered that the Clerk of the Court substitute Terry Royal for

1    Respondent William Gittere, enter judgment, and close this case.

2

3        Dated this 10th day of January 2025.

4

5                                        _____

6                                        ANNE R. TRAUM
                                         UNITED STATES DISTRICT JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28